UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| ARTHUR JACKSON, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Civil Action No. 06-01672 (ESH) |
| ) | |
| MICHAEL J. ASTRUE,[1] ) | |
| Commissioner of the ) | |
| Social Security Administration, ) | |
| ) | |
| Defendant. ) | |
| ) | |

## MEMORANDUM OPINION

Plaintiff applied to the Social Security Administration ("SSA") for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI"). After his claim was denied both initially and upon reconsideration, he received a hearing before an administrative law judge ("ALJ"). The ALJ denied his claim, the Appeals Council denied review, and plaintiff brought suit in this Court. The parties have now filed cross-motions for judgment. For the reasons set forth herein, plaintiff's motion will be granted and defendant's motion will be denied.

## BACKGROUND

**I.     Evidence before the ALJ**

   **A.     Function Reports**

On August 3, 2004, plaintiff stated in an SSA function report that he lived with his sister and that his daily activities consisted of watching television, preparing a meal, going for a short

---

[1] Michael J. Astrue is substituted for his predecessor, Jo Anne B. Barnhart, as Commissioner of the Social Security Administration. Fed. R. Civ. P. 25(d)(1).

walk, and going to bed.  (*Id*. at 89.)  Plaintiff further reported that he attended Narcotics Anonymous ("NA") meetings and Bible study three times a week, but that he needed to be reminded to go and needed someone to accompany him.  (*Id*. at 93.)  Plaintiff also needed to be reminded to take care of his personal hygiene and to perform the single household chore of which he was capable - - sweeping a "very small area" of the floor.  (*Id*. at 90, 91.)

On February 23, 2005, plaintiff completed an additional function report with the assistance of his counselor at the Green Door, which is a mental health and rehabilitation clinic.  (*See id.* at 97-104.)  This report stated that plaintiff's daily routine was to "stay home" except for doctor's appointments at the Green Door and NA meetings.  (*Id*. at 97.)  Plaintiff's lack of concentration reportedly "deter[red] him from cooking" and prevented him from doing household chores.  (*Id.* at 99-100.)  The report also stated that plaintiff had difficulty following written instructions, did not handle stress well, and was easily frustrated.  (*Id*. at 102-03.)

On March 7, 2005, plaintiff's sister, Lucy Hunt, completed an additional report on plaintiff's functioning.  (*Id*. at 105-13).  According to Hunt, plaintiff has problems sleeping at night because he hears voices, his clothes are in disarray, and he has to be reminded to bathe.  (*Id*. at 106.)  Hunt further stated that plaintiff cannot handle money because he loses it (*id.* at 109), that he is unable to follow written or spoken instructions (*id*. at 110), that he cannot handle stress or changes in routine (*id.* at 111), and that he has a fear of being left alone.  (*Id.*)

**B.     Medical Records**

The medical records before the ALJ included a psychological evaluation conducted by Neil Schiff, Ph.D., in October 2004 (*see id.* at 271-74); a consultative medical evaluation conducted by Dr. Raphael Lopez in April 2005 (*see id.* at 334-37); and progress notes chronicling plaintiff's treatment at the Green Door from January 2005 through January 2006,

including evaluations conducted by Dr. David Ault, plaintiff's treating psychiatrist.  (*See id.* at 344-417.)

Dr. Schiff described plaintiff's "overall cognitive abilities" as falling in the "extremely low to borderline ranges."  (*Id*. at 272.)  Plaintiff's Full Scale IQ was 69, his Verbal IQ was 72, and his Performance IQ was 72.  (*Id.*)  Plaintiff's General Memory Index score - - which Dr. Schiff characterized as "the best overall measure of the types of abilities that are critical to effective memory in day-to-day tasks" - - fell in the "Low Average range, which [was] somewhat higher than his overall level of cognitive functioning."  (*Id*.)  Plaintiff "performed in the borderline range on working Memory tasks, which involve attention, concentration, and the ability to manipulate information in short-term memory."  (*Id.*)  Dr. Schiff also observed that plaintiff "appear[ed] to receive significant assistance from his sister with activities of daily living" and that he suffered from frequent anxiety and paranoia.  (*Id*. at 271-72.)  In summary, Dr. Schiff concluded that plaintiff's "medical condition and anxiety symptoms [would] likely negatively impact upon his ability to maintain employment."  (*Id*. at 272.)

In an April 2005 examination conducted by Dr. Lopez, plaintiff complained of bilateral wrist and ankle pain.  (*Id.* at 334.)  X-rays of plaintiff's right wrist and ankle were normal, and Dr. Lopez found "no evidence of instability or atrophy and . . . no crepitation."  (*Id.* at 335.)  Accordingly, Dr. Lopez diagnosed plaintiff with "complaints of pain in both wrists and both ankles which did not significantly interfere with his activities of daily living."  (*Id*.)

On January 25, 2006, having treated plaintiff for a full year, Dr. Ault completed a medical assessment of plaintiff's work-related activities and mental status ("the Medical Assessment").  (*See id*. at 339-43.)  In the Medical Assessment, Dr. Ault diagnosed plaintiff as having a major depressive disorder with psychotic features.  (*See id.* at 341.)  He found that

plaintiff had "[m]arked restriction of activities of daily living;" "[m]arked difficulties in maintaining social functioning;" "[d]eficiencies of concentration, persistence or pace resulting in frequent failure to complete tasks in a timely manner;" and "[r]epeated episodes of deterioration or decompensation in work or work-like settings." (*Id.* at 342-43.)  Dr. Ault also determined that plaintiff suffered from "auditory hallucinations and paranoia" (*id.* at 342); that he had difficulty concentrating and thinking (*see id.* at 339, 340, 342); and that, because of these symptoms, he was "prevent[ed] . . . from forming new memories effectively."  (*Id*. at 340.)

### C. Hearing Testimony

Plaintiff's administrative hearing took place on February 10, 2006 (*see id.* at 426), at which time he was fifty-three years old.  (*Id.* at 428.)  Plaintiff testified that he has a high school education and has worked as a school janitor, a warehouse material specialist, and a security guard/project manager.  (*Id*.)  Plaintiff further testified that he has constant difficulty concentrating (*id*. at 439) and that his depression causes crying and mood swings that prevent him from working.  (*Id*. at 434.)  When asked whether he takes medication to treat his depression, plaintiff replied that he takes Lexapro for depression and Seroquel at night to help him sleep and prevent him from hearing voices.  (*Id*. at 434-35.)  Plaintiff testified that he only leaves the house to attend medical and counseling appointments (*id.* at 436) and that he prefers someone to accompany him because he hears voices and experiences mood swings.  (*Id.* at 437.)  Plaintiff also attested to feeling paranoid around large numbers of people.  (*Id*. at 437-38.)

## II. The ALJ's Decision

In denying plaintiff's claim, the ALJ applied the five-step sequential evaluation process

prescribed by 20 C.F.R. §§ 404.1520 and 416.920.[2]  (*See id.* at 15-22.)  The ALJ found that plaintiff had satisfied the first two steps of the process: he had not engaged in gainful employment during the relevant time period, and he had two "severe" impairments - - osteoarthritis and an organic mental disorder - - that "significantly restrict[ed] his ability to perform some basic work activities."  (*Id.* at 16; *see id.* at 22.)  However, the ALJ did not address whether plaintiff's depression constituted a severe impairment.  (*See id.* at 16.)  Nor did the ALJ, when he reached step three, consider the effect of plaintiff's osteoarthritis and organic mental disorder in conjunction with his depression.  (*See id.*)  Instead, without reference to plaintiff's depression, the ALJ determined that plaintiff's impairments did not meet or equal the impairments set forth in the "Listings of Impairments."  (*Id*. at 16; *see id.* at 22.)  Accordingly the ALJ proceeded to step four and ultimately to step five.

In assessing plaintiff's residual functional capacity ("RFC") and ability to perform work at step four, the ALJ determined that plaintiff was not credible "as to . . . being unable to engage

---

[2] The D.C. Circuit outlined this five-step process in *Butler v. Barnhart*:

> The claimant carries the burden of proof on the first four steps.  First, the claimant must demonstrate that she is not presently engaged in "substantial gainful" work.  Second, a claimant must show that she has a "severe impairment" that "significantly limits [her] physical or mental ability to do basic work activities."  Third, if the claimant suffers from an impairment that meets the duration requirement and meets or equals an impairment listed in Appendix 1 to the Commissioner's regulations, she is deemed disabled and the inquiry is at an end.  If the claimant does not satisfy step three, the inquiry proceeds to the fourth step, which requires her to show that she suffers an impairment that renders her incapable of performing "past relevant work."  Once a claimant has carried the burden on the first four steps, the burden shifts to the Commissioner on step five to demonstrate that the claimant is able to perform "other work" based on a consideration of her "residual functional capacity" . . . , age, education and past work experience.

353 F.3d 992, 997 (D.C. Cir. 2004) (citations omitted) (alteration in original) (quoting 20 C.F.R.§§ 401.1520, 416.920).

5

in work related activities during any 12-month continuous period during the period under review." (*Id.* at 19.) In support of this finding, the ALJ cited what he believed to be inconsistencies in plaintiff's hearing testimony and the SSA function reports that plaintiff and his sister had completed. (*See id.*) The ALJ stated that plaintiff "adamant[ly] deni[ed]" earlier statements that he "prepares his own meals, cooks some meals, and performs household chores such as sweeping the floor, goes outside, travels by walking and taking public transportation, shops in stores, watches television, draws, and attends Bible study three times a week." (*Id.*) Moreover, the ALJ stated that "[e]ven when given an opportunity to alter his testimony as to his inability to engage in any of the foregoing activities [plaintiff] adamantly denied the same and indicated that he was 'certain' he had not done so." (*Id.*) The ALJ "[found] it interesting [that plaintiff] denied all these activities of daily living at the hearing," and he characterized "the extent to which [plaintiff] would go to try to obtain disability benefits" as "readily apparent." (*Id.*) The ALJ additionally suggested that plaintiff had attempted to exaggerate the effect of his medications on his ability to work. (*See id.* at 20 ("[Plaintiff] initially indicated that the medications he was taking {e.g. Lexapro} were helping with his mental problems and that he did not experience any medications side effects but he would later alter his testimony to indicate that the Seroquel that he takes causes him to be drowsy. On further cross examination he admitted that he takes this medication in the evening and it helps him sleep so the same would not inhibit his ability to work during the day.").) Moreover, the ALJ suggested that, "in light of [plaintiff's] less th[a]n credible presentation at the hearing one might reasonably even question" plaintiff's statement that he had not used drugs since June 21, 2004. (*Id.*) In summary, the ALJ determined that plaintiff was "not credible with regard to his allegations that he is unable to perform any type of work." (*Id.*)

In assessing plaintiff's RFC at step four, the ALJ also considered the medical records of Drs. Schiff, Lopez, and Ault. (*See id.* at 18-19.) Although acknowledging that Dr. Schiff had "indicated that [plaintiff's] overall cognitive abilities fell within the extremely low to borderline ranges," that "his memory skills fell . . . in the low average range," and that his "medical condition and anxiety symptoms would 'likely negatively impact his ability to maintain employment,'" the ALJ "[found] it important that Dr. Schiff did not say [plaintiff] was totally disabled or prohibited from working." (*Id.* at 18.) With respect to Dr. Lopez's assessment that plaintiff "complain[ed] of pain in both wrists and both ankles" when there was no objective evidence of impairment, the ALJ stated that Dr. Lopez "apparently questioned" the truth of plaintiff's complaints. (*Id.*) Finally, the ALJ rejected Dr. Ault's conclusion that plaintiff "was marked in restrictions of activities of daily living, marked in maintaining social functioning, had deficiencies of concentration, persistence, or pace resulting in failure to complete tasks in a timely manner, and had repeated episodes of deterioration or decompensation to work or work-like settings." (*Id.*) According to the ALJ, "Dr. Ault's evaluation [was] internally inconsistent . . . [and was] undercut by [plaintiff's] statements of activities contained in the Exhibits" - - activities which plaintiff had since "adamantly denied" doing. (*Id.* at 19.) The ALJ also stated that plaintiff's "less th[a]n credible" performance at the administrative hearing "raise[d] further questions as to the extent that others such as Dr. Ault may have relied on 'claimant reporting' in rendering opinions supporting his disability." (*Id.*)

Although it is far from clear, it appears that the ALJ concluded that plaintiff lacks the RFC to perform past relevant work. (*See id.* at 23 (stating in the findings section of the opinion that plaintiff was "unable to perform any of his past relevant work"); Def.'s Mem. in Supp. at 4 n.3 (presuming that, because the ALJ "went to step five and made an alternate finding that

7

[plaintiff] was . . . able to perform other work that exists in significant numbers in the national economy," the ALJ's ultimate conclusion was that plaintiff could not perform relevant past work). *But see* AR 20 (stating in the analysis section of the opinion that plaintiff could perform his past work as a janitor or material specialist).) However, based on the findings that plaintiff was not credible and that none of the relevant medical opinions supported a complete inability to work, the ALJ concluded that plaintiff retains the RFC for "a significant range of medium work and alternatively light and sedentary work." (*Id.* at 21.)

At step five, the ALJ considered whether "jobs exist in the national economy for an individual of [plaintiff's] age, education, past relevant work experience, and [RFC] as determined." (*Id.*)  Relying on the testimony of a vocational expert ("VE"), the ALJ determined that there are many jobs that plaintiff can still perform. (*See id.*)  The ALJ therefore denied plaintiff's claim, holding that he was "not disabled." (*Id*. at 24.)

## ANALYSIS

**I.     Standard of Review**

In reviewing a denial of Social Security benefits, the Court "may not reweigh the evidence . . . , nor may it replace the [agency's] judgment concerning the weight and validity of the evidence with its own." *Davis v. Heckler*, 566 F. Supp. 1193, 1195 (D.D.C. 1983). Nevertheless, an ALJ's decision must be more than rubber stamped. The Court must carefully scrutinize the record to ensure that the ALJ "has analyzed all the evidence and has sufficiently explained the weight . . . given to obviously probative exhibits." *Davis v. Shalala*, 862 F. Supp. 1, 4 (D.D.C. 1994) (quoting *Simms v. Sullivan*, 877 F.2d 1047, 1050 (D.C. Cir. 1989)).  The ALJ's decision can be affirmed only when the reasons articulated therein are supported by substantial evidence. *See, e.g.*, *Howard v. Bowen*, 638 F. Supp. 68, 70 (D.D.C. 1986) ("If the

reasons supporting the Secretary's determination, as presented in the ALJ's written decision, are inadequate, and if that determination is otherwise unsupported by substantial evidence, it must be reversed."). Substantial evidence is evidence that "a reasonable mind might accept as adequate to support a conclusion," which means "more than a mere scintilla." *Richardson v. Perales*, 402 U.S. 389, 401 (1971).

"In addition, because the broad purposes of the Social Security Act require a liberal construction in favor of disability, the Court must view the evidence in the light most favorable to the claimant. This way, the Court can give effect to the remedial purposes of the Social Security Act." *Davis*, 862 F. Supp. at 4 (citations omitted).

## II. The ALJ's Determination That Plaintiff Lacked Credibility Is Not Supported by Substantial Evidence

In determining plaintiff's RFC, the ALJ relied heavily on his finding that plaintiff's testimony regarding his total inability to work was incredible. (*See id.* at 19-20.) The ALJ attempted to justify his finding by repeatedly emphasizing that from the witness stand plaintiff had "adamant[ly] deni[ed]" doing activities that he had admitted to doing in the SSA function reports. (*Id.* at 19.) According to the ALJ, plaintiff persisted in his "adamant[] deni[als]" even when expressly offered the opportunity to correct his testimony. (*See id.*)

But as conceded by defendant, the ALJ's characterization of plaintiff's hearing testimony is unsupported by the record. (*See* Def.'s Mot. at 10-11.) As a threshold matter, plaintiff's testimony was not meaningfully inconsistent with the function reports. (*Compare* AR 432 (stating that plaintiff does not "really" participate in activities and that he "stay[s] in the house" except when he "need[s] to go out . . . to the store or something"), *and id.* at 436 (stating that plaintiff "stay[s] in the house" except for attending meetings with doctors or his counselor), *with*

9

*id.* at 89, 93 (stating that plaintiff stayed home except for taking short walks and attending NA meetings and Bible study), *and id.* at 97 (stating that plaintiff's daily routine was to "stay home," with the exception of doctor's appointments and NA meetings).)  Moreover, as defendant has observed, "[t]he transcript of the hearing does not support the ALJ's [repeated] statement[s] that [p]laintiff 'adamantly' denied the activities of daily living that he had reported earlier."  (Def.'s Mot. at 10; *see id.* at 432, 436.)  As defendant has also recognized, the transcript makes clear that, contrary to the ALJ's representation, "[p]laintiff was not questioned about the discrepancy in his hearing testimony . . . and the earlier reported activities of daily living."  (Def.'s Mot. at 10; *see* AR 432, 436.)  Thus, as recognized by the government, the record does not support the ALJ's finding that plaintiff lacked credibility, and the Court cannot rely on that finding to sustain the ALJ's determination of plaintiff's RFC.

**III.   The ALJ's Rejection of Dr. Ault's Opinion Was Based on His Erroneous Determination as to Plaintiff's Credibility**

Defendant contends that the ALJ's determination of plaintiff's RFC (and the consequent denial of plaintiff's claim) may nevertheless be sustained because the "record as a whole" contains substantial evidence that plaintiff was able to perform work activity.  (Def.'s Mot. at 11.)  Specifically, defendant argues that the ALJ's determination of plaintiff's RFC may be sustained because (1) Dr. Schiff found that plaintiff's General Memory Index score was in the "Low Average" range, meaning that it was "fair for the ALJ to conclude that [plaintiff] can perform a full workday level of activity" (*id.* at 8); (2) Dr. Ault stated that plaintiff was "in fairly 'good order' with medication and treatment" (*id.* at 9); and (3) the ALJ was justified in rejecting "Dr. Ault's opinion that [p]laintiff had marked restrictions in the four functional areas set out in section 12.04 of the Listings."  (*Id.* at 6; *see id.* at 6-7.)  The Court need only address the last of these arguments because, absent substantial evidence to support the ALJ's finding that plaintiff

lacked credibility, this case must be remanded for the ALJ to reconsider the weight to be accorded Dr. Ault's opinion regarding plaintiff's marked functional restrictions.[2]

"Case law in this Circuit affords great weight to a treating physician's assessment." *Lockard v. Apfel*, 175 F. Supp. 2d 28, 33 (D.D.C. 2001). "Furthermore, 'an ALJ who rejects the opinion of a treating physician must explain his reasons for doing so.'" *Id.* (quoting *Williams v. Shalala*, 997 F.2d 1494, 1498 (D.C. Cir. 1993)). Here, Dr. Ault's assessment is the only treating physician's assessment in the record. (Pl.'s Mem. in Supp. at 15.) In explaining his rejection of the treating physician's assessment, the ALJ correctly recognized that the issue of plaintiff's credibility is inextricably intertwined with the weight to be accorded Dr. Ault's opinion. (*See* AR 19 (stating that Dr. Ault's opinion was unreliable because plaintiff lacked credibility and "Dr. Ault may have relied on 'claimant reporting'"); *id.* (linking the determination that "Dr. Ault's evaluation [was] internally inconsistent" with the determination that his evaluation was "undercut by claimant's statements of activities contained in the Exhibits [albeit the claimant at the hearing adamantly denied that she [*sic*] had been able to do the activities set forth in the exhibits . . .] . . . .").) Since the ALJ erred in finding that plaintiff lacked credibility, his conclusion regarding Dr. Ault's testimony is equally flawed. Thus, pursuant to the fourth sentence of 42 U.S.C. § 405(g), the Court will reverse the agency decision and remand this case for the ALJ to reassess what weight to accord the opinion of Dr. Ault *without* reference to findings regarding plaintiff's credibility that lack evidentiary support.[3] *See, e.g.*, *Melkonyan v.*

---

[2] If on remand it is determined that Dr. Ault's assessment should be accepted, defendant's remaining arguments will become moot, since the testimony of the VE made clear that, if one were to credit Dr. Ault's assessment, "it would be very difficult for [plaintiff] to maintain [unskilled] work or any kind of work." (AR 446; *see id.* at 445-46 (asking the VE to assess plaintiff's ability to work based on the Medical Assessment completed by Dr. Ault).)
[3] If on remand the ALJ determines that Dr. Ault's opinion deserves the weight ordinarily accorded to the opinions of treating physicians, it would also be prudent for the ALJ to revisit

*Sullivan*, 501 U.S. 89, 98 (1991) ("The fourth sentence of § 405(g) authorizes a court to enter 'a judgment affirming, modifying, or reversing the decision of the Secretary, with or without remanding the cause for a rehearing.'" (quoting 42 U.S.C. § 405(g))).

## CONCLUSION

For the reasons set forth herein, the Court will deny defendant's motion, grant plaintiff's motion, and remand this case pursuant to 42 U.S.C. § 405(g) for further findings in accordance with the applicable regulations.  A separate Order accompanies this Memorandum Opinion.

                                                          /s/
                                       ELLEN SEGAL HUVELLE
                                       United States District Judge

Date: July 26, 2007

---

steps two and three of the sequential disability analysis before reaching the question of plaintiff's RFC.  As the Court has observed (*see supra* page 5), the ALJ failed to take plaintiff's depression into account when determining whether plaintiff has impairments that alone or together constitute "severe" impairments meeting or equaling the impairments set forth in the Listings (*see* AR 16), although plaintiff has persuasively argued that "[crediting] Dr. Ault's and Dr. Schiff's assessment[s] would result in a finding that [plaintiff's] condition meets the criteria in Listing 12.02 and 12.04."  (Pl.'s Mem. in Supp. at 17; *see* AR 341-43 (indicating that plaintiff meets at least four of the requirements of 12.04(A) and all of the requirements of 12.04(B)); *id.* at 342-43 (indicating that plaintiff meets all of the requirements of 12.02(B)).)